J-S26016-23; J-S26017-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 530 EDA 2023 |

Appeal from the Order Entered February 9, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002134-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: D.Z.T.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 531 EDA 2023 |

Appeal from the Decree Entered February 9, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000744-2021

J-S26016-23; J-S26017-23

IN THE INTEREST OF: E.B., A MINOR   :   IN THE SUPERIOR COURT OF
      :       PENNSYLVANIA
      :
APPEAL OF: L.B., MOTHER       :
      :
      :
      :
      :
      :   No. 532 EDA 2023

Appeal from the Order Entered February 9, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000742-2020,
CP-51-DP-0000742-2020, CP-51-DP-0000742-2020


IN THE INTEREST OF: E.A.B., A   :   IN THE SUPERIOR COURT OF
MINOR       :       PENNSYLVANIA
      :
      :
APPEAL OF: L.B., MOTHER       :
      :
      :
      :
      :   No. 533 EDA 2023

Appeal from the Decree Entered February 9, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000745-2021

J-S26016-23; J-S26017-23

| IN THE INTEREST OF: D.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 662 EDA 2023 |

Appeal from the Order Entered February 9, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002134-2018

| IN THE INTEREST OF: D.Z.T.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 663 EDA 2023 |

Appeal from the Decree Entered February 9, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000744-2021

| IN THE INTEREST OF: E.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: T.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 664 EDA 2023 |

Appeal from the Order Entered February 9, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000742-2020

- 3 -

J-S26016-23; J-S26017-23

IN THE INTEREST OF: E.A.B., A : IN THE SUPERIOR COURT OF
MINOR : PENNSYLVANIA
:
:
APPEAL OF: T.B., FATHER :
:
:
:
:
: No. 665 EDA 2023

Appeal from the Decree Entered February 9, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000745-2021

BEFORE: STABILE, J., KUNSELMAN, J., and McLAUGHLIN, J.

MEMORANDUM BY KUNSELMAN, J.: **FILED SEPTEMBER 25, 2023**

In these matters, L.B. (Mother) and T.B. (Father) appeal the decrees
that terminated their parental rights to their sons, 4-year-old D.B., and 2-
year-old E.B. (the Children), pursuant to the Adoption Act. *See* 23 Pa.C.S.A.
§ 2511(a)(2), (5), (8) and (b). Each parent also appeals the decision to
change the goal of the dependency proceedings from a concurrent
reunification and adoption goal, to just an adoption goal. *See* 42 Pa.C.S.A. §
6351. Because each parent's appeal raises the substantially the same issues
and involves the same facts and circumstances, we address the parents'
appeals together in one decision. After review, we affirm the trial court's
decrees, and we dismiss the challenges to the goal change orders as moot.

The Philadelphia Department of Human Services (DHS) became involved
with the family in January 2018 after receiving a report following the birth of

- 4 -

D.B. The report alleged that both Mother and D.B. tested positive for marijuana and phencyclidine (PCP). The report alleged that there was no record Mother received prenatal care. DHS was also concerned there was domestic violence in the home. Although Mother denied the same, hospital records indicated that Mother had been seen in the emergency room after she was abused by Father.

Notwithstanding these allegations, the case did not become court-active. Between January 2018 and September 2018, DHS worked with the family to address the concerns relating to Mother's drug use and domestic violence. Mother enrolled in a drug treatment program, and DHS implemented in-home services through Community Umbrella Agency (CUA). But by July 2018, Mother had only attended about half of her treatment sessions, and she had again tested positive for marijuana and PCP. She also admitted that she had cancelled one of D.B.'s occupational therapy appointments and did not attend some of the child-specific programming. Moreover, Mother did not participate in some of the domestic violence programming. In September 2018, DHS filed a dependency petition for D.B.

On November 1, 2018, the juvenile court adjudicated D.B. dependent. Still, D.B. was not removed from Mother's care. Instead, the court directed DHS to investigate inpatient treatment programs and/or whether Mother could move to a shelter that accepts mothers with children. The court also directed DHS to investigate kinship placement resources.

In December 2018, Mother obtained a temporary Protection From Abuse (PFA) order. Mother alleged that she and Father were arguing; that Mother ran out of the house and into the street to get away from Father, when she was hit by a car. Mother was taken by ambulance, but she was treated and released. The court ultimately dismissed Mother's temporary PFA order without prejudice, after Mother did not proceed with the final hearing.

In February 2019, Mother again tested positive for marijuana and PCP. Although Mother subsequently began outpatient drug treatment, Mother again tested positive for PCP in April 2019. Thereafter, Mother and D.B. returned to inpatient drug treatment. Mother was otherwise moderately compliant with her single case plan objectives. The court did not remove D.B. from Mother's care. Instead, the court ordered that Mother be referred to domestic violence counseling and that she remain at the inpatient drug facility until she was clinically discharged. At the June 2019 permanency review hearing, the court determined Mother was mostly compliant with her plan. By September 2019, Mother was so compliant with her objectives that the court entered an order terminating court supervision. DHS continued to monitor the family throughout the rest of 2019 and into 2020.

In July 2020, E.B. was born. Mother and E.B. tested positive for marijuana and PCP at E.B.'s birth, just as Mother did at the birth of D.B. Mother told DHS that she relapsed after witnessing the murder of her friend. Mother said she had been attending an outpatient drug treatment program, and that she would re-enroll in the inpatient program. DHS visited the family's

home and discovered that the home was infested with roaches, including inside the freezer and refrigerator, and that there were no beds for the Children. Meanwhile, the Children had been staying with a family friend. Although the Children were safe, DHS ultimately concluded that the family friend was not an appropriate caregiver. DHS obtained an order of protective custody and sought kinship placements. The juvenile court placed D.B. and E.B. in the homes of two different maternal cousins.

The adjudicatory hearing was continued several times for, among other reasons, Father's lack of services. The Children were ultimately adjudicated dependent in November 2020. The court ordered an array of services to address the parents' drug use and domestic violence issues. The goal of the dependency proceedings was reunification. Mother's objectives were: to achieve and maintain sobriety; to comply with intensive outpatient treatment; to improve parenting skills; and to ensure the Children's basic needs were met. Father had substantially the same objectives, with the added directive that he make himself available for services and comply with recommendations from CUA.

In May 2021, the goal of the dependency proceedings changed from reunification to a concurrent goal of reunification and adoption. Throughout this time, the parent's objectives largely remained the same. Mother had been minimally compliant, but Father was not compliant at all. Around September 2021, the Children moved into the home of foster mother, J.R.

On December 9, 2021, DHS filed separate termination petitions against Mother and Father. Mother had made minimal progress during the preceding months. Importantly, Mother was noncompliant with submitting to drug and alcohol screens, nor did she comply with the services meant to address domestic violence or her parenting skills. She was also not consistent with her visitation goal.

The termination proceedings were continued several times throughout 2022. The trial court finally conducted the first day of the hearing on January 23, 2023. Neither parent was present. The court continued the hearing for a second day of testimony to February 2, 2023. Again, neither parent appeared, but the court agreed to leave the record open and allow the parents an opportunity to give testimony. On February 9, 2023, the parties rested their cases. The court subsequently granted the petitions and terminated the parents' rights under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b). The court further changed the goal from concurrent planning to adoption. Mother and Father timely filed these appeals; they challenge both the termination decrees, and the goal change orders, as to each Child.

Mother presents the following issues:

1. Did the trial court err as a matter of law or abuse its discretion where it determined that the requirements of 23 Pa.C.S.A. § 2511(a) to terminate Mother's rights were met?

2. Did the trial court err as a matter of law or abuse its discretion where it determined that 23 Pa.C.S.A. § 2511(b) were met?

   3. Did the trial court err as a matter of law or abuse its discretion where it determined that the permanency goal for the Children should be changed to adoption?

Mother's Brief at 3 (cleaned up).

Father raises substantially the same issues:

   1. Whether the trial court committed error by involuntarily terminating Father's parental rights where such determination was not supported by clear and convincing evidence establishing grounds for termination under the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8)?

   2. Whether the trial court committed error by involuntarily terminating Father's rights where such ruling did not give primary consideration to the developmental, physical, and emotional needs and welfare of the Children as required by the Adoption Act, 23 Pa.C.S.A. § 2511(b)?

   3. Whether the trial court committed error by changing the Children's permanency goal from reunification to adoption?

Father's Brief at 9.

We begin with our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Our Supreme Court has stated that in termination cases, deference to the trial court is particularly crucial. *In re Adoption of L.A.K.*, 265 A.3d 580, 597 (Pa. 2021); *see also Interest of S.K.L.R.*, 265 A.3d 1108, 1124 (Pa. 2021) ("When a trial court makes a 'close call' in a fact-intensive case involving…the termination of parental rights, the appellate court should review the record for an abuse of discretion and for whether evidence supports that trial court's conclusions; the appellate could should not search the record for contrary conclusions or substitute its judgment for that of the trial court."). The abuse-of-discretion standard in termination cases "is a highly deferential standard and, to the extent that record supports the court's decision, we must affirm even though evidence exists that would also support a contrary determination." *In re P.Z.*, 113 A.3d 840, 849 (Pa. Super. 2015) (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section 2511(b): determination of the needs and welfare of the child[.]

*In re C.M.K.*, 203 A.3d 258, 261-262 (Pa. Super. 2019) (citation omitted).

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting *Matter of Adoption Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).

These appeals implicate Sections 2511(a)(1), (2), (5), (8) and (b), which provide:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> [...]
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of

the parental rights would best serve the needs and welfare of the child.

[…]

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8).

We may uphold a termination decision if any proper basis exists for the result reached. *C.S.*, 761 A.2d at 1201. Specifically, we need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Therefore, we review the trial court's decision that DHS proved termination was warranted under Section 2511(a)(2).

To terminate parental rights under Section 2511(a)(2), DHS must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal cause the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019) (citation omitted). The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa.

Super. 2010). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties. ***Id.***

We begin with Mother's appeal. In its Rule 1925(a) opinion, the trial court determined DHS met each element of the Section 2511(a)(2) analysis:

> At the hearing on February 2, 2023, this Court heard clear and convincing evidence from CUA Manager, James Allen, who testified that he had been the case manager […] since January of 2022. Mr. Allen testified that Mother had single case plans throughout the life of the case, that CUA regularly held single case plans meetings regarding these objectives, and that they have remained substantially the same since Mr. Allen was assigned the case in January of 2022. Mr. Allen testified that Mother was not compliant with her case plan objective to reengage and complete drug and alcohol treatment nor did she provide Mr. Allen with proof of treatment. Mr. Allen also testified that Mother refused to complete random drug screens[.]
>
> Mother did not attend random drug screens […], she did not provide CUA with her updated address, nor did she provide CUA with an opportunity to evaluate her current residence. Mr. Allen testified he had no knowledge of Mother being employed.
>
> […]
>
> Mr. Allen testified that he has concerns with the Children being reunified with Mother. Mother does not present herself in a stable manner and is unprepared for the responsibilities of being the Children's mother. Mother struggles with simple things, such as buying clothes that are too small for the Children.
>
> Mr. Allen testified that since his assignment on the case, Mother has had weekly supervised visitations with D.B. and E.B. Mother attended approximately twenty to thirty visits with D.B. and E.B. totaling twenty to thirty hours of interaction with the Children. While these visits were mostly consistent, Mr. Allen testified that periodically Mother would not show up. Mr. Allen testified that on one visit he observed D.B. ignore[] Mother and was non-responsive to

- 13 -

her communication with him. During some visits, Mother would completely ignore the Children, would be on the phone, would show up with food and eat the food during the visit but would not bring any food for the Children, and would use profanity or yell at the Children when communicating with them. Mr. Allen testified that Mother does not communicate with the Children between visits. On one occasion, Mr. Allen testified that Mother reported that she moved to Johnstown and she was gone for a few weeks thereafter. Mother initially texted Mr. Allen letting him know she was thinking of moving to Johnstown, and two weeks later sent Mr. Allen another message that she was in Johnstown and unavailable for visits. Mother did not provide CUA with her Johnstown address. Approximately three weeks later, Mother indicated she was in Philadelphia, yet still did not provide an address to CUA.

[…]

Mr. Allen testified that Mother had previously completed anger management, but she remained aggressive with him and other CUA staff. Mother was ordered to complete a parenting and anger management program and did not follow up on that order.

The court found that Mr. Allen's testimony was credible. Mother was notified of her single case plan objectives on February 23, 2021. Mother refused to comply with random drug screens, failed to provide an address of her home and thus afford CUA the opportunity to assess her home. Mother failed to provide CUA proof of employment and failed to provide proof of completion of drug and alcohol treatment, per her single case plan objectives. Mother has not remedied the conditions which led to the removal of D.B. and E.B. The court found credible the testimony from Mr. Allen that Mother had drug screens and refused to attend them; that at Mother's last screen on August 22, 2022, she tested positive for PCP and marijuana; that there was no proof of Mother attending drug and alcohol treatment programs; that Mother never provided an address for her home to be assessed by CUA.

Trial Court Opinion, 4/3/23, (T.C.O. 1) at 24 -26; 28 (style adjusted).

Under Section 2511(a)(2), DHS may prove – among other suitable reasons for termination – parental incapacity. Mother argues there was no evidence of incapacity. To make this argument, however, Mother confines the definition of incapacity to only include mental incapacity. *See* Mother's Brief at 17-18. Mother's construction of Section 2511(a)(2) is too narrow. In *C.M.K.*, for instance, we concluded that the local child protective services agency proved parental incapacity when it established the parent's inability to make substantial progress toward their reunification goals – specifically the parent's sobriety goal. *See C.M.K.*, 203 A.3d at 262-63. In other words, *C.M.K.* supports the notion that a parent's habitual drug use may be fairly construed as contributing to parental incapacity.

Like in *C.M.K.*, Mother has been incapable of caring for the Children for years. A principal cause for this inability, though not the exclusive cause, has been Mother's failure to achieve sobriety. In this context, "incapacity" recognizes that the parent's drug addiction, by nature, overrides an individual's will – in this case, Mother's will to properly care for her children. But another view of drug addiction, albeit a harsher one, could be to construe the parent's addiction as a "refusal" to parent. Both "incapacity" and "refusal" are bases for termination under Section 2511(a)(2) – to say nothing of parental "neglect." In any event, the trial court was within its discretion to conclude that Mother's prolonged addiction had caused the Children to be without parental care, and that she cannot, or will not, remedy the same. We

- 15 -

discern no error or abuse of discretion regarding the court's decision to terminate Mother's rights under Section 2511(a)(2).

For his part, Father argues that trial court erred under Section 2511(a)(2) because there was no evidence that Father was unwilling or refused to care for the Children. **See** Father's Brief at 31. He also cites his repeated statement that he loves his Children and wants them placed in his care. **Id.**

In its Rule 1925(a) opinion regarding Father's case, the trial court made the following findings:

> At the hearing on January 10, 2023, this court heard clear and convincing evidence from CUA case manager, James Allen, who testified that he had been the case manager since January 3, 2022. Mr. Allen testified that at the time the Children were adjudicated dependent on November 20, 2020, there were concerns regarding Father about drug and alcohol use, domestic violence, and neglect. Mr. Allen testified that Father had single case plan objectives and that they have remained substantially the same since Mr. Allen was assigned the case on January 3, 2022. CUA regularly held single case plan meetings regarding these objectives. Mr. Allen testified that Father's single case plan objectives were communicated to Father verbally, and Father and Mr. Allen spoke after court multiple times in the presence of Father's lawyer. […] Mr. Allen believed that based on those conversations, Father understood that his compliance with the single case plan objectives was necessary in order to be reunified with his Children. Mr. Allen testified that Father's response to the communications regarding single case plan objectives was that "nobody was going to tell him [Father] what to do."
>
> Mr. Allen testified that Father was not compliant with any of his case plan objectives. Father's single case plan objectives included making himself available for services; comply with CUA services and recommendations; engage in domestic

- 16 -

violence; complete a CEU drug assessment, as well as three random[ drug screens]; comply with family school services; and avail his home for a walkthrough. Mr. Allen testified that Father failed random drug screens for testing positive for marijuana. Even though Father indicated to Mr. Allen that he had a marijuana card, the card was never provided.

Mr. Allen went on to testify that the last time Father responded to any of Mr. Allen's communication efforts to him was on March 17, 2022, and on that date Father's response to Mr. Allen was "Yes, sir, Master." Mr. Allen reached out to Father via text and phone calls, to no avail since last hearing from him in March of 2022. Mr. Allen stated that Father had not spoken to him outside of being in the courtroom when he appeared at court, which was in July of 2022. Mr. Allen stated that at the July 2022 courtroom appearance by Father, Father provided his home address and indicated he lived there with [Mother]. Mr. Allen testified that Father held this address out to be a place where the Children could live once reunified, but did not provide any additional information, such as how many bedrooms or the living situation if the Children went to live there. Father was aware at the time that Mr. Allen would have to make an in-person visit to verify the home was appropriate for the Children before they could live there. The court order from the July 2022 hearing required Mr. Allen to do a home assessment within 20 days of that hearing, which Mr. Allen was unable to complete because Father was not responsive.

Mr. Allen further testified that Father did not engage in any type of drug and alcohol treatment, did not provide any proof of completion of domestic violence counseling, and did not allow Mr. Allen to evaluate his home. Mr. Allen attempted to go to Father's home at least five times since being assigned to the case on January 3, 2022, and each time there was no answer at the door.

Mr. Allen also testified Father has not visited the Children since Mr. Allen's assignment to the case on January 3, 2022. Father also had no communications with the Children through the foster parent.

Trial Court Opinion, 4/17/23 (T.C.O. 2.), at 24-27 (citations to the record omitted) (style adjusted).

After review, we conclude that the trial court did not err or abuse its discretion when it concluded that Father's repeated and continued refusal to parent has caused the Children to be without essential care. It is quite evident that Father cannot or will not remedy the same. Father was required to make diligent efforts toward the reasonably prompt assumption of his duties. **Z.P.**, 994 A.2d at 1117. He made no efforts. Notwithstanding Father's inaction on his reunification plan, Father avers that he loves his Children and wants them in his care. However, a parent's own feelings of love and affection for a child, alone, do not prevent the termination of parental rights. **See, e.g., In re T.M.T.**, 64 A.3d 1119, 1128 (Pa. Super. 2013).

Having concluded that the trial court did not err or abuse its discretion under the first prong of the termination analysis under Section 2511(a) for both parents, we next review the court's conclusion that termination would best serve the Children's needs and welfare under Section 2511(b). That subsection provides:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which

- 18 -

> are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

This Court has explained:

> [S]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.,* 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Concerning the bond, the question is not merely whether a bond exists, but whether termination would destroy this existing, necessary and beneficial relationship. *See C.M.K.*, 203 A.2d at 264 (citation omitted); *see also K.Z.S.*, 946 A.2d at 764 (holding there was no bond worth preserving where the child had been in foster care for most of the child's life, which caused the resulting bond to be too attenuated). Moreover, the court is not required to use expert testimony to resolve the bond analysis. *In re Z.P.*, 994 A.2d 1108, 1121 (citing *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008)).

"Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." **T.S.M.**, 71 A.3d at 268. Finally, we emphasize that "[w]hile a parent's emotional bond with [their] child is a major aspect of the Section 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." **In re N.A.M.**, 33 A.3d 95, 103 (Pa. Super. 2011) (citation omitted).

Instantly, the trial court issued the following findings to support its decision that DHS met its burden under Section 2511(b):

> In regard to Section 2511(b) and the best interest of D.B. and E.B., Mr. Allen testified that D.B. and E.B. have been placed with their current foster parent since December of 2021. He testified that he has observed the Children with the foster parent once a month in the foster home, as well as weekly when the foster parent brings the Children to CUA for supervised visits. Mr. Allen testified that the relationship between the foster parent and D.B. looks like that of a mother and child. D.B. Looks to the foster parent for necessities like food. Mr. Allen testified that D.B. looks to the foster parent for love, protection, and support, and looks to his foster parent as his caretaker and provider. The most recent time that Mr. Allen saw D.B. was January 2, 2023, and he was safe and his needs were being met. Mr. Allen did not believe D.B. would suffer irreparable harm if Mother's parental rights were terminated and that Mother does not provide him with a stable environment. Mr. Allen went on to testify that E.B.'s relationship with the foster parent is nearly identical to that of D.B.'s relationship with the foster parent, with more codependence on the foster parent since E.B. is younger. E.B. looks to the foster parent for help with things such as getting dressed. E.B. likewise looks to the foster parent for love, protection, and support. Mr. Allen did not believe E.B. would suffer irreparable harm

if Mother's parental rights were terminated, based on his age and Mother's lack of parental engagement.

Mr. Allen testified that during the one visit with Mother in September of 2022, he personally observed Mother upset and disconnected from D.B. and E.B., focused only on her newborn baby and caused a scene at the agency regarding her newborn baby.[1]  Mr. Allen stated this had no effect on D.B. and E.B. because they were not paying attention to Mother.  D.B. and E.B. do not talk about nor ask about Mother.  Mr. Allen testified that Mother does not inquire about D.B. or E.B. nor has she asked for additional visits with them.

[…]

In regard to Section 2511(b) and the best interest of D.B. and E.B., the court found credible the testimony of Mr. Allen regarding the lack of a parent/child bond between Mother and D.B. was well as Mother and E.B.  The court found credible the testimony regarding Mother's use of profanity and yelling around the Children, and Mother's failure to redirect the Children.  The Children have been with their foster parent since December 2021.  The court also found credible the [representation made by the Child Advocate, who said] that D.B. indicated he wanted [his] foster mom to be [his] mommy.  Consequently, the court found that the termination of Mother's parental rights would be in the best interest of the Children pursuant to 23 Pa.C.S.A. § 2511(b).

T.C.O.1 at 26-29 (citations to the record omitted) (footnote added) (style adjusted).

Mother argues that because she consistently visited with the Children, termination of her rights would not best serve the needs and welfare. ***See generally*** Mother's Brief at 23-24.  Mother reasons that she did the best she could, and notwithstanding her difficulties, she was still able to maintain a

---

[1] We note that Mother's newborn baby is not the subject of these appeals.

relationship with the Children. *Id.* at 24. While Mother's consistency was laudable, we must recognize that after the Children were removed in November 2020, Mother never progressed in her single case plan to warrant much more than weekly supervised visitation. As a result, the bond between the Children and Mother grew attenuated. In her absence, the Children turned to the foster mother for their needs and security. The trial court's thorough findings under this subsection are all supported by the record. We discern no abuse of discretion.

Father's argument under Section 2511(b) is there was insufficient evidence to support the trial court's conclusion that termination would best serve the Children's needs and welfare. We disagree. In its Rule 1925(a) opinion, the trial court set forth the following findings:

> In regard to Section 2511(b) and the best interest of [the Children], Mr. Allen testified that D.B. and E.B. have been placed with their current foster parent since December of 2021. He testified that he had observed the Children with the current caregiver, and the Children had a bond with the resource parent. Mr. Allen stated that the relationship looked to be that of "normal four- and two-year-old children, running around playing." Mr. Allen testified that E.B. and D.B. look to the resource parent for necessities like food when they are hungry. Mr. Allen testified that the relationship between the resource parent and the Children looks to be that of a typical parental relationship, and that D.B. and E.B. look to the foster parent for love, protection, and support. The most recent time that Mr. Allen saw D.B. and E.B. was on January 2, 2023, and they were safe and their needs were being met. Mr. Allen did not believe D.B. and E.B. would suffer irreparable harm if Father's parental rights were terminated, based on Father being absent from the Children's lives for close to two years. E.B. has no relationship with Father being that he is only two years old,

> and D.B. was unable to identify who his father was. The Children have never asked about Father nor asked to visit with Father since Mr. Allen has been on the case.
>
> [...]
>
> In regard to Section 2511(b) and the best interest of D.B. and E.B., the court found credible the testimony of Mr. Allen regarding the lack of a parent/child bond between Father and D.B. as well as Father and E.B. The court found credible the testimony Father did not make any attempts in more than a year to see or communicate with his Children. The Children did not ask about Father nor ask to visit with Father. The Children have been with their foster parent since December 2021. Consequently, the court found that termination of Father's parental rights would be in the best interest of the Children pursuant to 23 Pa.C.S.A. § 2511(b). Additionally, termination of parental rights would not have a detrimental effect on the developmental, physical, and emotional needs of D.B. and E.B.

T.C.O.2 at 27-28 (citations to the record omitted) (style adjusted).

After review, the record supports these findings, and thus we conclude the court did not err or abuse its discretion when it determined that the termination of Father's rights would best serve the needs and welfare of the Children under Section 2511(b).

Finally, we note that both parents challenge the trial court's decision to change the permanency goal of the dependency proceedings from a concurrent goal to the goal of adoption. Instantly, our decision to affirm the trial court's termination decree necessarily renders moot any challenge to the goal change orders. *See In re Adoption of A.H.*, 247 A.3d 439, 446 (Pa. Super. 2021); *Interest of D.R.-W.*, 227 A.3d 905, 917 (Pa. Super. 2020); *see also In re D.A.*, 801 A.2d 614, 616 (Pa. Super. 2002) ("An issue before

a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force of effect."). Accordingly, we dismiss the parents' appeal of the goal change issue as moot.

In short, we hold that the trial court did not abuse its discretion or commit an error of law in terminating Mother's and Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b).

Decrees affirmed. Appeals as to permanency goal change orders dismissed as moot.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/25/2023